**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

**MARY V. EDELEN,**

      **Plaintiff,**

**vs.**                    **Case No. 4:09cv229-RH/WCS**

**MICHAEL J. ASTRUE,
Commissioner of Social Security,**

      **Defendant.**

_____/

## REPORT AND RECOMMENDATION

This is a social security case referred to me for a report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D. LOC. R. 72.2(D). It is recommended that the decision of the Commissioner be reversed and the Commission ordered to grant Plaintiff's applications for benefits.

**Procedural status of the case**

Plaintiff, Mary V. Edelen, applied for disability insurance benefits and supplemental security income benefits. Her last date of insured status for disability benefits was March 31, 2007. Plaintiff alleges disability due to degenerative disc

disease with back pain, hepatitis C with fatigue, and anxiety and depressive disorders, with onset on December 19, 2002. Plaintiff was 46 years old at the time of the administrative hearing (on December 5, 2005), has a 12th grade equivalency education and a degree as a licensed practical nurse, and has past relevant work as a licensed practical nurse. The Administrative Law Judge found that Plaintiff had the residual functional capacity to do a limited range of sedentary work, could do her past relevant work in a sedentary capacity as a nursing supervisor or a nursing consultant, and thus was not disabled.

**Legal standards guiding judicial review**

This court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles. <u>Chester v. Bowen</u>, 792 F.2d 129, 131 (11th Cir. 1986). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." <u>Bloodsworth v. Heckler</u>, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); <u>Moore v. Barnhart</u>, 405 F.3d 1208, 1211 (11th Cir. 2005). "The Commissioner's factual findings are conclusive if supported by substantial evidence." <u>Wilson v. Barnhart</u>, 284 F.3d 1219, 1221 (11th Cir. 2002). "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it." <u>Phillips v. Barnhart</u>, 357 F.3d 1232, 1240, n. 8 (11th Cir. 2004) (citations omitted). The court must give "substantial deference to the Commissioner's decision." <u>Dyer v. Barnhart</u>, 395 F.3d 1206, 1211 (11th Cir. 2005). "A 'substantial evidence' standard, however, does not permit a court to

uphold the Secretary's decision by referring only to those parts of the record which support the ALJ. A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983). "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.' " Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 423(d)(2)(A). A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). Both the "impairment" and the "inability" must be expected to last not less than 12 months. Barnhart v. Walton, 535 U.S. 212, 122 S.Ct. 1265, 1272, 152 L.Ed.2d 330 (2002).

The Commissioner analyzes a claim in five steps. 20 C.F.R. § 404.1520(a)-(f):

1.      Is the individual currently engaged in substantial gainful activity?

2.      Does the individual have any severe impairments?

3.      Does the individual have any severe impairments that meet or
        equal those listed in Appendix 1 of 20 C.F.R. Part 404?

4.      Does the individual have any impairments which prevent past
        relevant work?

5.      Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of

the application for benefits.  A positive finding at step three results in approval of the

application for benefits.  At step four, the claimant bears the burden of establishing a

severe impairment that precludes the performance of past relevant work.  If the claimant

carries this burden, the burden shifts to the Commissioner at step five to establish that

despite the claimant's impairments, the claimant is able to perform other work in the

national economy.  Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050,

1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must prove

that he or she cannot perform the work suggested by the Commissioner.  Hale v.

Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

**Evidence from the administrative hearing**

Plaintiff testified that in her past work as a licensed practical nurse, she changed,

lifted, turned, and bathed patients, did diabetic checks, took vital signs, dispensed

medication, and maintained charts.  R. 426, 433.  The job required a lot of standing,

walking, and lifting.  R. 427.  She also worked in several jobs as a clinical respiratory

coordinator and a clinical coordinator, and in those jobs, she sat for about 6 hours a

day.  R. 429, 431.

Plaintiff said that she stopped working due to back pain, and this was the main thing that kept her from working.  R. 436, 443.  She said she had a lot of pain with "just basic sitting, standing."  R. 436.  She was asked how long she could sit, and Plaintiff said that "with medication, an hour or so at most."  R. 443.  At another point, she said she could sit uncomfortably with medication for one hour at a time.  R. 440.  She testified that she could stand for only 15 to 30 minutes, and could walk only 100 feet.  R. 436.  She said that she tries to walk maybe 5 or 10 minutes a day.  R. 439.  Plaintiff said that she could lift a gallon of milk with both hands, and could use her hands for simple grasping and manipulation.  R. 436.  Plaintiff said that for the prior year, she had spent much of her time on the bed or the couch, walking intermittently.  R. 439.  She said that she spends six hours a day lying down.  *Id*.

Plaintiff said that she had had back trouble since her early twenties.  R. 437.  She worked as a truck driver after her first back surgery in 1999.  *Id*.  She had a second back surgery in January, 2002.  *Id*.  She said she tried to go back to work after the second surgery, in a desk job for American Home Patient, but did that job only three days a week for only three weeks.  *Id*.  She said she could not do the job due to inability to sit and lift.  *Id*.  Dr. Mann and Dr. Mathews were then treating her.  *Id*.

Plaintiff said that she is able to make a simple breakfast, take her medicine, and then lie down to relieve the pain.  R. 447.  She said that standing at the stove was "very difficult."  R. 448.  She said that she does not do any housework except for very light work.  *Id*.  She cannot vacuum or sweep.  *Id*.  Her mother and father do the housework for her.  *Id*.  She said that if she hangs onto the counter, she is able to place dishes into

her dish washer once a week. *Id.* Plaintiff said that she is able to watch television, read, and use the computer. R. 450. She said that she is not able to do yard work or sew. *Id.* She drove from Tennessee to Tallahassee, a six hour trip, when she moved to this area, but her father had driven her to Tennessee. *Id.* Plaintiff said that she was able to drive to the grocery store and shop once a week or every two weeks. *Id.*

Plaintiff said that she suffered extreme fatigue as a result of having hepatitis C. R. 450. She said she was at stage 2, and the only treatment left was a kidney transplant. R. 451.

**Medical evidence**[1]

On December 10, 2001, Plaintiff was seen by Scott D. Boden, M.D., at the Emory Spine Center. R. 160. She complained of back and left leg pain. *Id.* Dr. Boden noted that three years earlier, Plaintiff had similar symptoms and had back surgery. *Id.* The first surgery involved an L5-S1 fusion with autograft for isthmic L5-S1 spondylolisthesis.[2] *Id.* Dr. Boden said that relief from the surgery had lasted two years. *Id.* Plaintiff said

---

[1] Descriptions of the purpose and effects of prescribed drugs are from PHYSICIANS' DESK REFERENCE, as available to the court on Westlaw, or PDRhealth™, PHYSICIANS DESKTOP REFERENCE, found at < http://www.pdrhealth.com/drugs/drugs-index.aspx >. Information about medical terms and prescription drugs come from DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS, available at: http://www.mercksource.com (Medical Dictionary link) or MEDLINE PLUS, found at www.nlm.nih.gov/medlineplus/mplusdictionary.htm. Social Security Rulings can be found at: http://www.ssa.gov/OP_Home/rulings/rulfind1.html. The pages at these websites are not attached to this report and recommendation as the information is relatively well-settled, the precise definitions are not at issue in this case, and the definitions are not likely to be in dispute.

[2] Spondylolisthesis is a condition in which a bone (vertebra) in the lower part of the spine slips forward and onto a bone below it. A sign of this condition is that a straight leg raise may be uncomfortable or painful. DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS.

that initially she had 90% improvement after her last surgery, but now had to take

narcotics daily with only 10% relief. *Id.* Plaintiff reported to Dr. Boden that she was

limited in walking, sitting, standing, sleeping, recreational activities, getting dressed, and

work around the house. *Id.* She said that she could walk for less than 5 minutes and sit

for less than 15 minutes. *Id.* She experienced pain 90% of her waking hours at level 8

or 9 on a scale of 10. *Id.* Plaintiff said that she was not working due to spinal problems.

*Id.* On examination, Dr. Boden found lower lumbar and sacroiliac tenderness, and

decreased back extension with pain. R. 161. Flexion of her back was to mid-thigh with

pain and with severe guarding. *Id.* Lateral bending and rotation were limited. *Id.* Motor

strength was intact without calf or thigh atrophy. *Id.* On review of imaging, Dr. Boden

found that Plaintiff had angular instability and pseudoarthrosis at L5-S1, with moderate

degenerative changes at L5-S1. *Id.* Dr. Boden's diagnosis was past spinal surgery with

recurrent symptoms, herniated disc on the left, foraminal at L5-S1, and pseudoarthrosis

at L5-S1. *Id.* He thought that Plaintiff had a large disc fragment on the left, and ordered

a lumbar CT scan. R. 162. Plaintiff wished to proceed with surgery, and a second

surgery (a "revision laminectomy L5, diskectomy left L5-S1, fusion L5-S1 with TS RH

screws/rods" and a "posterior right iliac crest bone graft") was scheduled for January 2,

2002. *Id.*

On March 4, 2002, after the surgery, Plaintiff was seen again by Dr. Boden. R.

158. She said she had some residual left buttock pain, but "overall the patient states

that her back pain is 60% improved." R. 158. However, imaging revealed "a question

of the left S1 screw which looks either bent or possibly broken." *Id.* Plaintiff continued

to need narcotics, which did not surprise Dr. Boden, as she had been on narcotics for several years, and she was referred to pain management and detoxification. *Id.* She was to continue to wear her back brace. *Id.*

On April 23, 2002, Plaintiff was seen by Leonard S. Leichus, M.D., on referral by Dr. Carla Holloman-Horton (Plaintiff's primary care physician). R. 182-183. Plaintiff said that in 1998 she learned that she had hepatitis C, and thought that she might have contracted it in 1988. R. 182. Plaintiff reported that she had "some associated lassitude and fatigue." *Id.* She was then taking Xanax,[3] Soma,[4] and Lortab.[5]

On June 17, 2002, Plaintiff was referred to Dennis C. Doherty, D.O., at Southeastern Pain Specialists, by Dr. Boden at the Emory Spine Center. R. 283. It was noted that she had persistent left hip pain after two lumbar fusion operations. *Id.* It was also observed that Plaintiff had "significant pain relief" after the second surgery. *Id.* She had injured her back 18 years earlier in a motor vehicle accident and injured it again in a horse riding accident. *Id.* Dr. Doherty related that over a period of time, Plaintiff had had physical therapy, nerve blocks, and had used a TENS unit. *Id.* He

---

[3] Xanax is a tranquilizer used in the short-term relief of symptoms of anxiety or the treatment of anxiety disorders. Anxiety associated with depression is also responsive to Xanax. PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

[4] Soma is used, along with rest, physical therapy, and other measures, for the relief of acute, painful muscle strains and spasms. PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

[5] Lortab is one of the brand names for hydrocodone. PHYSICIANS' DESK REFERENCE (2004), p. 3233. Hydrocodone is a semisynthetic narcotic derivative of codeine having sedative and analgesic effects more powerful than those of codeine. DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS.

said that she had taken Stadol,[6] Percocet,[7] OxyContin,[8] Darvocet with Zanaflex,[9]

Celebrex, Vioxx, and Robaxin,[10] "all with moderate to minimal relief." *Id.* Plaintiff

reported that she was experiencing exhausting, unbearable pain. *Id.* She reported that

pain completely controlled or interfered with her general activity level, mood, walking,

working, sleep, enjoyment of life, and ability to concentrate. *Id.* On examination, Dr.

Doherty said that Plaintiff's sitting tolerance was "unlimited." R. 284. He also found that

her gait was "fairly normal," but she had very limited flexion and extension, with

increased lumbar lordosis, from the standing position. *Id.* Straight leg raising in the

seated position was negative. *Id.* Plaintiff's strength was 5/5 throughout the lower

extremity. *Id.* He determined that she had had "excellent improvement status post re-

operation and fusion some six months ago." *Id.* He planned to stabilize Plaintiff's

---

[6] Stadol is a trademark for the tartrate of butorphanol. Butorphanol is a synthetic analgesic and antitussive opioid drug administered for the relief of pain. MEDLINE PLUS (MERRIAM-WEBSTER).

[7] Percocet, a narcotic analgesic, is used to treat moderate to moderately severe pain. It contains two drugs – acetaminophen and oxycodone. Acetaminophen is used to reduce both pain and fever. Oxycodone, a narcotic analgesic, is used for its calming effect and for pain. PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

[8] OxyContin is an opioid analgesic consisting of oxycodone hydrochloride; it has an abuse liability similar to morphine and is a schedule II controlled substance. It is used to manage moderate to severe pain when a continuous, around-the-clock analgesic is needed for an extended period of time. PHYSICIANS' DESK REFERENCE (2005).

[9] Zanaflex relaxes the tense, rigid muscles caused by spasticity. It is prescribed for people with multiple sclerosis, spinal cord injuries, and other disorders that produce protracted muscles spasms. PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

[10] Robaxin is prescribed, along with rest, physical therapy, and other measures, for the relief of pain due to severe muscular injuries, sprains, and strains. PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

medications and encourage a walking program. R. 285. He also considered lumbar facet blocks for residual posterior element pain and radiofrequency denervation if necessary. *Id.* He prescribed a Duragesic patch, Lortab for breakthrough pain, and Bextra. *Id.*

On July 18, 2002, Dr. Doherty administered bilateral lumbar facet injections. R. 174. On July 25, 2002, he performed radiofrequency denervation at lumbar facets L-2 through SA. R. 172. This was followed by injections of Marcaine and Depo-Medrol at the site. *Id.* His diagnosis was failed back surgery syndrome, lumbar spondylosis, and facet joint disease. *Id.*

Plaintiff was seen by Dr. Holloman at Quincy Family Medicine on August 27, 2002, October 22, 2002, November 20, 2002, December 13, 2002, January 6, 2003, January 30, 2003, February 20, 2003, for chronic lower back pain and symptoms from hepatitis C. R. 256-262.

On February 18, 2003, Plaintiff was seen again by Dr. Leichus for hepatitis C and increasing fatigue. R. 180. Dr. Leichus ordered several tests. *Id.* A liver biopsy revealed low grade chronic hepatitis. R. 184. Dr. Leichus read this as grade 1 stage 1 hepatitis C. R. 179. She began treatment with Pegasys injections on April 1, 2003. R. 178. On April 10, 2003, it was reported that Plaintiff was experiencing flu-like symptoms that lasted 24-48 hours, and her fatigue was "ongoing." *Id.* It was noted that Plaintiff was able to "deal" with her malady because she was not employed. *Id.* On May 2, 2003, advanced registered nurse practitioner Julia C. Pallentino, at Dr. Leichus's office,

said that Plaintiff was doing well with her treatments, but had flu-like symptoms after an injection. R. 177.

On June 10, 2003, ARNP Pallentino said that Plaintiff complained of "continuing fatigue, some mild shortness of breath, and flu-like symptoms that last the first three to four days [after an injection]." R. 176. Plaintiff was in her 11th week of therapy for hepatitis C. *Id.* She was taken Xanax "successfully" for anxiety. *Id.* The impression was that she was "doing quite well" on Pegasys therapy. *Id.*

On July 14, 2003, ARNP Pallentino said that Plaintiff had completed her 12th week of therapy. R. 175. Unfortunately, her virus count had increased, and Plaintiff was "quite devastated with this news." *Id.* Nurse Pallentino said that it was obvious that Pegasys had been ineffective in reducing Plaintiff's hepatitis C. *Id.* Plaintiff continued to experience "severe fatigue," but was relieved she would discontinue the medication because it had had a number of adverse side effects. *Id.*

Plaintiff was seen by Wayne Sampson, M.D., for a disability consultative examination on July 28, 2003. R. 212. Plaintiff told Dr. Sampson that she experienced constant pain radiating from her left hip to her posterior thigh, and had chronic numbness of her left calf. *Id.* Plaintiff said that when she last worked in November, 2002, as a clinical respiratory coordinator, a desk job, she had difficulty sitting and bending over. *Id.* She reported that she suffered "severe fatigue" from hepatitis C. *Id.* She said that she had difficulty grooming. *Id.* On examination, Dr. Sampson found that Plaintiff's motor strength was intact (5/5), but she had decreased sensation in her right medial foot and right anterior 4th and 2nd toes. R. 212-213. He found that she had

tenderness in her left lower back, and had pain in her left hip with left leg raising at 80 degrees.  R. 213.  Dr. Sampson's impression was low back pain (with Plaintiff stating that the pain was tolerable with the addition of a Duragesic patch), fatigue from hepatitis C, and anxiety disorder.  *Id.*

Plaintiff had a psychological consultative examination by Marie P. Hume, Ph.D., on August 21, 2003.  R. 224.  She was referred in connection with her application for disability benefits.  *Id.*  Plaintiff reported that she had tried to work in a desk job, but had to quit after three weeks because there was a lot of twisting and turning involved.  *Id.* Plaintiff said that she spent time at the pain clinic in Emory, when the second surgery was a failure.  R. 225.  She was currently using Duragesic patches, Xanax, and Phenigren, with Percocet for breakthrough pain.  *Id.*  Plaintiff told Dr. Hume that Xanax had kept the "anxiety enough away so I can cope."  *Id.*  She was depressed because she was 43 years of age and "in this kind of shape."  *Id.*  She felt sad "that she cannot do the things she wants to do or things she used to do."  *Id.*  "She would also like to work," said Dr. Hume.  *Id.*  Plaintiff said that her mother has multiple sclerosis, and she tries to care for her.  *Id.*  She said that she cannot lift her mother, or mop.  *Id.*  She said she could do laundry because her dryer unit is above her washer and she does not have to bend.  *Id.*  She said that she does not cook, and to relieve the pain, spends most of her time lying on her side.  *Id.*  She visits her mother only a couple of times a week because she has to rest for a couple of days between visits.  *Id.*  Plaintiff told Dr. Hume that she can dress herself sitting down, and is easily out of breath.  *Id.*  She said she can complete all basic activities of daily living, but that is hard for her and "she

requires excessive amounts of time and frequent breaks to get things done." *Id.* She had help from her family. *Id.* Dr. Hume found Plaintiff's mood to be depressed and her range of emotional expression to be flat. R. 226. Dr. Hume's diagnostic impression was anxiety disorder, not otherwise specified, and pain disorder due to both psychological factors and back problems. *Id.* Her prognosis was fair. *Id.* She thought that Plaintiff's anxiety was fairly well managed with medication, and her "primary problem is the pain and associated limitations due to her back." *Id.* She seemed able to cope with her depression. *Id.*

On December 17, 2003, Plaintiff returned to Dr. Doherty. R. 281. She presented with "persistent low back pain and lower extremity pain." *Id.* Dr. Doherty said his medical practice (Southeastern Pain Specialists in Atlanta) had not seen her since July, 2002, and she had been followed in Florida by Dr. Horton, who had been managing her pain "well over the past year." *Id.* Plaintiff said that she had a recent increase in breakthrough pain, but she reported good relief with her medications. *Id.* She was using a Duragesic patch, Percocet, Xanax, and Soma. *Id.* Plaintiff reported that her current pain level was 8 out of 10. *Id.* She told Dr. Doherty that this completely interfered with her ability to work, and seriously (8 or 9 out of 10) interfered with her walking, sleeping, enjoyment of life, and housework. *Id.* She said she was able to sleep only four hours at a time, and to be up and active for about four hours at a time. *Id.* Upon examination, Dr. Doherty noted pain with lumbar flexion and extension. *Id.* Her muscle strength was intact. R. 282. She had decreased sensation along the posterior portion of her left lower extremity. *Id.* Straight leg raising was positive on the

left and Faber's test was also positive for pain. *Id.* Dr. Doherty found pain on palpation "over bilateral PSIS." *Id.* His diagnosis was persistent low back pain and lumbosacral radiculitis.[11] *Id.* The plan was to begin Catapres TTS and continue use of the Duragesic patch. *Id.* Dr. Doherty also recommended aquatic or structured walking therapy. *Id.* He suggested several other narcotic pain relievers. *Id.*

On December 19, 2003, however, Dr. Holloman-Horton decided to continue with the medications without change. R. 245. She found Plaintiff's back condition to be unchanged. *Id.*

On February 12, 2004, Plaintiff told Dr. Holloman-Horton that she thought that her back pain was stable because she had been minimally active. R. 243. She had been able to skip medications because she was "sick of taking it." *Id.* A diagnosis of anxiety was noted. *Id.* Plaintiff returned to Dr. Holloman-Horton on March 9, 2004, April 5, 2004, May 5, 2004, May 27, 2004, June 21, 2004, July 21, 2004, August 20, 2004, September 14, 2004, and October 8, 2004, for a refill of the Duragesic patches and Percocet. R. 241-242, 322-328. The findings upon examination of Plaintiff's back were abnormal on most of these visits. *Id.* Depression and anxiety were noted on several of these visits. R. 322-326. It was noted on October 8, 2004, that Plaintiff needed a longer acting medication for depression. R. 322.

On December 20, 2004, Plaintiff was seen by Gurusam M. Lakshmin, M.D. R. 367. He said that she had failed back surgery, and needed to see a pain specialist in Atlanta annually. *Id.* Plaintiff told him that she was "in chronic discomfort all the time."

---

[11] Radiculitis is the inflammation of a nerve root. MEDLINE PLUS (MERRIAM-WEBSTER).

*Id.* On examination, Dr. Lakshmin observed low back pain and spasm, and Plaintiff was unable to do the straight leg raising test. *Id.* He refilled her medications, including Percocet. R. 369. On January 3, 2005, February 3, 2005, March 2, 2005, April 1, 2005, and May 1, 2005, Dr. Lakshmin refilled the prescription for Duragesic. R. 366, 364, 362, 358, 355. Percocet was refilled on January 17, 2005, February 18, 2005, and March 15, 2005. R. 365, 363, 361. On March 29, 2005, Dr. Lakshmin again noted low back muscle pain and spasm, and said that Plaintiff could not do the straight leg raising test. R. 356.

On May 10, 2005, Plaintiff was seen by Pain Management Specialists in Tallahassee. R. 351. The notes are signed by Debbie Dilmore ARNP, and Parveen Khanna, M.D. R. 353. She had been referred for evaluation by Dr. Lakshmin. R. 351. Plaintiff complained of sacral pain into the posterior aspect of her left thigh. *Id.* She reported that occasionally she had pain in her right buttock and leg. *Id.* Plaintiff was then using Duragesic patches and Percocet daily for breakthrough pain. *Id.* A review of systems noted a positive finding for paresthesia into the left leg and into the great and second toes. R. 352. On examination, tenderness was found on palpation of the left sacroiliac joint. *Id.* Plaintiff's muscle strength in her lower extremities was 5/5, and straight leg raising was negative bilaterally. *Id.* Patrick's exam was positive on the left. *Id.* Plaintiff's toe walk was painful. *Id.* Her range of motion of the lumbar spine was limited. *Id.* A facet load test could not be performed because the test was too painful for Plaintiff to extend her back. *Id.* The assessment was low back pain with radiculopathy. *Id.* An Aspen brace was prescribed, and an MRI of the lumbar spine

was order. R. 353. It was determined that continued use of Duragesic and Percocet was appropriate. *Id.*

On November 23, 2005, Plaintiff was seen by Douglas Mathews, M.D., at Neurological Surgeons in Nashville. R. 312. He wrote that Plaintiff had moved to Nashville from Atlanta about two months earlier. *Id.* A copy of Dr. Mathews's report was sent to Dr. Anurdha Mann, and Plaintiff had been referred to Dr. Mathews by Dr. Mann. R. 313, 314. Plaintiff had discontinued Duragesic patches, but still took Percocet and Robaxin. R. 312. Dr. Mathews noted that an MRI earlier that year showed "mild grade I spondylolisthesis L5 on S1 with pedicle screw fixation L5-S1 and mild inferior foraminal narrowing bilaterally," and there did not appear to be an interbody fusion. *Id.* Moderate disc degeneration at L5-S1 was noted. *Id.* Plaintiff sought a neurosurgical evaluation from Dr. Mathews. *Id.* Plaintiff had mild tenderness to palpation, and some back pain with mild radicular pain with straight leg raise maneuver on the left, but with no muscle weakness or atrophy. *Id.* Dr. Mathews said that it was possible that Plaintiff "can still have persistent mechanical back pain with continued motion at the degenerative disc despite attempts at stabilization fusion." *Id.* Further surgery was thought to be needed, depending on the results of lumbar discography. *Id.*

In November 29, 2005, Dr. Mann completed a Physical Capacity Evaluation form. R. 319-321. Dr. Mann said that Plaintiff was unable to stand or walk during a normal work day, and could sit for only one hour. R. 319. He said she could lift no weight, and could not use her hands repetitively to push or pull. *Id.* He said she could not bend, squat, crawl, or climb at all. *Id.* He said that she could not lift five pounds repeatedly.

R. 320.  He thought she could walk short distances, but could not sit six hours in a normal work day.  *Id.*  He thought that Plaintiff could not be expected to work eight hours a day, five days a week.  *Id.*

On December 28, 2005, Plaintiff returned to Dr. Mathews.  R. 349.  She had not been able to complete the discogram "secondary to significant pain related to the procedure."  *Id.*  Dr. Mathews noted that Plaintiff wanted to be gainfully employed but was unable to work for the past three years due to persistent pain and radicular complaints.  *Id.*  On examination, he found lumbar paraspinous tenderness on palpation, with mild radicular complaints on the left with straight leg raising.  *Id.*  Dr. Mathews thought that she might obtain improvement with another surgery.  *Id.*  Plaintiff wished to proceed with surgery.  *Id.*  A copy of the report was sent to Dr. Mann.  *Id.*

On January 10, 2006, Plaintiff underwent a third back surgery performed by Dr. Mathews.  R. 348.  The surgery was described as "a re-do decompressive lumbar laminectomy L5-S1 with removal of hardware, transforaminal lumbar interbody fusion L5-S1 with post non-segmental stabilization with pedicle screws and posterolateral fusion."  *Id.*  During the operation, Dr. Mathews determined that the S1 screw had fractured.  R. 340.  After the operation, Plaintiff "did well and had good relief of leg pain."  R. 348.  She was discharged with OxyContin, Percocet, Robaxin, and Keflex.  *Id.*

Her followup with Dr. Mathews was on February 1, 2006.  R. 347.  Dr. Mathews noted again that he found a fractured screw and pseudoarthrosis during surgery.  *Id.*  He said that Plaintiff had done "quite well," and had no radicular pain in the left lower extremity.  *Id.*  She felt that her back was more stable, though she still had numbness.

*Id.* Dr. Mathews said that Plaintiff had been "on a fair amount of medication" prior to surgery, and he hoped to decrease her narcotic intake. *Id.* He found that she had full strength and straight leg raising was negative. *Id.*

On February 14, 2006, Plaintiff called to advise Dr. Mathews that she had started walking that week, but was having pain in her left side. R. 346. She had stopped taking OxyContin, but was going to resume. *Id.* On March 1, 2006, Plaintiff advised Dr. Mathews that she had moved to Florida and her new physician was Dr. Joy Ablordeppey. R. 345.

On March 28, 2006, Dr. Mathews again saw Plaintiff. R. 390. He thought she had done well after the third surgery, had significantly reduced her pain medications, and was "more comfortable with regard to her back pain." *Id.* He prescribed Darvon with Percocet. *Id.* Plaintiff had some dyesthesias in her legs which Dr. Mathews attributed to postoperative scarring that she has had before the last surgery, but she had good strength in her legs and "no straight leg raise." *Id.*

Plaintiff was seen as a new patient by Nicodemo Macri, M.D., on April 20, 2006, in Tallahassee. R. 384. A copy of Dr. Macri's report was sent to Dr. Ablordeppey, her family physician. R. 385-386. Plaintiff was then taking Percocet, 4 to 5 tablets daily, and Robaxin, 4 tablets daily. R. 384. Plaintiff's chief complaint was pain that was fixed in her lumbar sacral region. *Id.* Plaintiff said she was not currently driving, and had moved back to the Tallahassee area to live with her family. R. 385. Dr. Macri said that Plaintiff had poor posture and fatigues easily. *Id.* He said that it was "difficult for her to sit for long periods of time. Her pain gets worse." *Id.* Plaintiff's pain was "somewhat

relieved with walking," but he thought that she could not sit or walk for longer than an hour at a time. *Id.* He found that she could not squat more than 1.5 inches, and her "range of motion is severely decreased," 40% in all planes. *Id.* Dr. Macri said that he had to control Plaintiff's pain "while the healing process continues," and said that he would have to "wait and see if the fusion will take it." *Id.* He planned to "start tapering up dosages of Methadone" and reduce the narcotics. R. 386. He also prescribed Percocet, 5 or 6 times a day. *Id.* He wanted to control Plaintiff's weight, by eating reduction and by increasing mobility and cardiovascular endurance. *Id.* He noted that Plaintiff had a pool, and he wanted her to start pool therapy, four or five times a day. *Id.*

On May 11, 2006, Dr. Macri said that Methadone caused Plaintiff to experience extreme nausea, anxiety, and heart palpitations. R. 383. Plaintiff had been swimming twice a week. *Id.* Her pain was better controlled, but she still used Percocet 5 times daily. *Id.* Plaintiff said that the Duragesic patches had helped more than Percocet, so Dr. Macri prescribed Duragesic, and he limited the Percocet to 3 times daily. *Id.*

On June 1, 2006, Plaintiff returned to Dr. Macri with a report of weight loss and continued use of pool therapy. R. 382. Her mood was "uplifted." *Id.* Her pain was currently controlled by Duragesic patches. *Id.* Plaintiff planned to be seen again in August by Dr. Mathews. *Id.*

On August 3, 2006, Dr. Mathews again saw Plaintiff. R. 398. She was then seven or eight months past her third surgery. *Id.* Plaintiff told Dr. Mathews that she felt that her back was more stable, but "she still has a fair amount of back pain." *Id.* She was under the care of Dr. Macri, a pain specialist, in Thomasville, Georgia. *Id.* On

examination, Dr. Mathews found no straight leg raise sign, no tenderness in the lumbar spine, and "mild difficulty in flexing her big toe on the left" but with "good extension and good foot flexion and extension." *Id.* Dr. Mathews concluded: "Given the chronicity of her back and radicular complaints for many years, I do think it is reasonable that she is disabled from this condition." *Id.*

On August 3, 2006, Dr. Mathews also completed a Residual Functional Capacity Questionnaire. R. 392. He thought that Plaintiff can stand or walk 2 hours in a workday, and sit for up to 4 hours a day. *Id.* He thought she could lift up to 10 pounds, and could not crawl or climb, and could bend or squat only occasionally. *Id.* He said that he did not think that Plaintiff could "sustain activity at a pace and with the attention to task as would be required in the competitive work place." *Id.* He also thought that Plaintiff could not attend employment for an 8 hour day, 5 days a week. R. 383. He said that these limitations had existed for the prior four years. *Id.*

On September 15, 2006, Dr. Macri also completed a Residual Functional Capacity Questionnaire. R. 395. He thought that Plaintiff could stand and walk only 1 hour a day, and sit for no more than 2 hours. *Id.* He thought that Plaintiff could not lift any weight, and could not push or pull with her hands. *Id.* He thought she could not bend, squat, crawl, or climb at all, and could not sustain activity at a pace and with the attention required in a competitive work place. *Id.* The basis of this opinion, he said, was failed back syndrome, pseudoarthrosis, chronic pain syndrome, obesity, and thyroid disease. R. 396. He said Plaintiff could not be expected to attend work 8 hours a day, 40 hours a week. *Id.*

After the ALJ rendered his decision, additional evidence was submitted from Dr. Macri. On January 31, 2007, Dr. Macri said that although Plaintiff's pain was better controlled and she was in a walking program and doing pool therapy, he doubted that she would ever return to nursing full time due to the severity of her radicular pain. R. 413. He noted tightness in Plaintiff's hamstrings, decreased sensation at L4-S1, and "intrinsic wasting and weakness." *Id.* He thought that if her pain became better controlled, she might "consider doing something part time." *Id.*

**Legal analysis**

**The opinions of three treating physicians**

Plaintiff contends that the Administrative Law Judge erred in his evaluation of the opinions of treating physicians, Dr. Mathews, Dr. Macri, and Dr. Mann. Defendant contends that because Plaintiff was treated by Dr. Mann on one to three visits, Dr. Mann did not have the status of a treating physician. Doc. 20, p. 19. As will be discussed ahead, the ALJ did not determine that Dr. Mann was not a treating physician.[12] Indeed, he deemed Dr. Mann's opinion to be worthy of consideration in the same manner as the opinions of Dr. Mathews and Dr. Macri. R. 38. In any event, the question is of little importance as Dr. Mathews and Dr. Macri are treating physicians, Dr. Mann must have

_____

[12] On administrative review of an action of an agency of the Executive Branch, this court may not "substitute counsel's *post hoc* rationale for the reasoning supplied by the" agency itself. N.L.R.B. v. Kentucky River Community Care, Inc., 532 U.S. 706, 715 n.1, 121 S.Ct. 1861, 1868 n.1, 149 L.Ed.2d 939 (2001), *quoting*, N.L.R.B. v. Yeshiva Univ., 444 U.S. 672, 685, n. 22, 100 S.Ct. 856, 63 L.Ed.2d 115 (1980) (citing Securities and Exchange Commission v. Chenery Corp., 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947)); Real v. Simon, 514 F.2d 738, 739 (5th Cir. 1975) (denying rehearing of Real v. Simon, 510 F.2d 557 (5th Cir. 1975)); Golembiewski v. Barnhart, 322 F.3d 912, 916 (7th Cir. 2003); Fargnoli v. Massanari, 247 F.3d 34, 44 n. 7 (3d Cir. 2001).

had Plaintiff's medical records available to him, he treated Plaintiff for some period, and

he came to essentially the same residual functional capacity assessment as Dr.

Mathews and Dr. Macri.

The opinion of a claimant's treating physician must be accorded considerable

weight by the Commissioner unless good cause is shown to the contrary. Lewis v.

Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997). This is so because treating physicians:

> are likely to be the medical professionals most able to provide a detailed,
> longitudinal picture of your medical impairment(s) and may bring a unique
> perspective to the medical evidence that cannot be obtained from the
> objective medical findings alone or from reports of individual examinations,
> such as consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(d)(2). Important to the determination of whether there is a

"detailed, longitudinal picture" of impairments is the length of the treatment relationship,

the frequency of examination, the extent of the knowledge of the treating source as

shown by the extent of examinations and testing, the evidence and explanation

presented by the treating source to support his or her opinion, the consistency of the

opinion with the record as a whole, and whether the treating source is a specialist with

respect to the particular medical issues. 20 C.F.R. § 404.1527(d)(2)-(5).

The reasons for giving little weight to the opinion of a treating physician must be

supported by substantial evidence, Marbury v. Sullivan, 957 F.2d 837, 841 (11th Cir.

1992), and must be clearly articulated. Phillips v. Barnhart, 357 F.3d 1232, 1241 (11th

Cir. 2004). "The Secretary must specify what weight is given to a treating physician's

opinion and any reason for giving it no weight, and failure to do so is reversible error."

MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986).

This circuit finds good cause to afford less weight to the opinion of a treating physician "when the: (1) treating physician's opinion is not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records."  Phillips v. Barnhart, 357 F.3d 1232, 1240-1241(11th Cir. 2004); Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991) ("The treating physician's report may be discounted when it is not accompanied by objective medical evidence or is wholly conclusory.").  *See also*, Crawford v. Commissioner Of Social Security, 363 F.3d 1155, 1159 (11th Cir. 2004) (finding good reasons articulated by the ALJ to discount the treating physician's opinion).

The Administrative Law Judge gave no weight to the opinion of Dr. Mathews, Plaintiff's treating surgeon, or the opinions of Drs. Mann and Macri.  The following are the initial reasons given:

> The opinions indicating that the claimant is permanently disabled, as well as the limitations set forth in these Exhibits, are not supported by the progress notes of these doctors, it is inconsistent with the doctor's own medical records, or by any objective medical findings reported in the treatment records of any of the treating physicians; and further, are contrary to the claimant's own testimony to what she indicated was able to do and to her daily activities.

R. 38.

The ALJ devoted a paragraph to Plaintiff's own account of her daily activities as one reason why he disbelieved the three treating physicians.  R. 38.  I have reported what Plaintiff said at the hearing about her daily activities, and little of that testimony is substantial evidence to reject the opinions of treating physicians.  Probably the evidence that stands out the most is that Plaintiff drove six hours to Florida from Tennessee when

she moved to this area. But she returned to Florida in March, 2006, shortly after her third surgery, when the good effects of that surgery still were being felt, so the fact that she drove that distance is not, standing alone, substantial evidence to discount the opinions of the treating physicians. Whether Plaintiff said that, with medication, she can sit for two hours or for no more than two hours is a quibble without meaning. That Plaintiff can take narcotic medication and sit for two hours is not substantial evidence from which to reject the opinions of the treating physicians, that she cannot sit for 6 or more hours in an 8 hour day and focus upon work, the kind of sitting ability she would need to do a sedentary job. A sedentary job, *ipso facto*, is a job that requires the ability to sit for most of an 8 hour work day and to maintain concentration, persistence, and pace for that period. There is essentially nothing in Plaintiff's testimony to justify a rejection of the opinions of the three treating physicians. Plaintiff testified that she needs help with daily activities, and cannot do much, and has to lie down much of the time to relieve pain. Indeed, the testimony fully corroborates those opinions.

The ALJ also noted that in March, 2002, Dr. Boden said that Plaintiff's pain had improved by 60%. R. 38. This observation occurred two months after the second surgery. Dr. Boden also said, however, that imaging had revealed "a question of the left S1 screw which looks either bent or possibly broken," and Plaintiff continued to need narcotics for pain. R. 158. By January 10, 2006, Plaintiff's back condition had again deteriorated such that she had to have a third back surgery performed by Dr. Mathews. R. 348. A note from 2002 that Plaintiff's condition had temporarily improved after the

second surgery is not substantial evidence to discount the opinions of treating physicians.

The ALJ noted that in July, 2003, Dr. Sampson found that Plaintiff's cranial nerves two through twelve were grossly intact, her motor strength was 5/5, she had decreased sensation of the right medial foot and right anterior 4th and 2nd toes, her gait was narrow, she was able to stand and walk on her heels and toes, and his diagnosis was low back pain that was tolerable with the Duragesic patch. R. 39. These findings are individually supported by substantial evidence in the record, but the ALJ did not explain how these findings from July, 2003, were substantial evidence to discount the opinions of three treating physicians. The twelve cranial nerves arise from the lower surface of the brain.[13] Cranial nerves have nothing to do with nerves exiting from the lumbar region of the spine.[14] That Plaintiff's muscle strength was undiminished was found on several examinations, and this is some evidence to discount the opinions of treating physicians, but Dr. Sampson also found that Plaintiff had decreased sensation in the right lower extremity, which indicates nerve damage in the spine. The walking tests (heel, toe, gait) did not test walking endurance. Further, the findings of Dr. Sampson were in July, 2003, and the evidence is plain that Plaintiff's condition continued to deteriorate again until she had her third back surgery. Standing alone, this

---

[13] MEDLINE PLUS, found at www.nlm.nih.gov/medlineplus/mplusdictionary.htm.

[14] *See* http://www.med.yale.edu/caim/cnerves/.

one-time consultative examination by Dr. Sampson is not a basis for discounting the opinions of three treating physicians.[15]

The ALJ next made reference to medical records from Dr. Doherty in December, 2003. R. 39. Except for a finding that Plaintiff's muscle strength was intact, the findings of Dr. Doherty on December 17, 2003, are not substantial evidence in this record to discount the opinions of the three physicians. Plaintiff said that she had had an increase in breakthrough pain, and was then medicated with strong pain medications, a Duragesic patch, Percocet, Xanax, and Soma. R. 281. She told Dr. Doherty that her pain completely interfered with her ability to work, and seriously (8 or 9 out of 10) interfered with her walking, sleeping, enjoyment of life, and housework. *Id.* She said she was able to sleep only four hours at a time, and to be up and active for about four hours at a time. *Id.* These subjective symptoms were confirmed by Dr. Doherty. On examination, he noted pain with lumbar flexion and extension. *Id.* He found that Plaintiff had decreased sensation along the posterior portion of her left lower extremity, and straight leg raising on the left and Faber's test were both positive for pain; Plaintiff had pain on palpation "over bilateral PSIS," and Dr. Doherty's diagnosis was persistent low back pain and lumbosacral radiculitis. R. 282. These findings are entirely consistent with the opinions of the three treating physicians.

The ALJ also referred to the medical records from Dr. Holloman-Horton in 2004 as a reason to disbelieve the treating physicians. R. 39. He said that her physical

---

[15] A consultative examination, that is, a one-time examination by a physician who is not a treating physician, need not be given deference by the Commissioner. McSwain v. Bowen, 814 F.2d 617, 619 (11th Cir. 1987); Kirby v. Astrue, 500 F.3d 705, 709 (8th Cir. 2007) (a consulting physician's opinion "deserves no special weight").

examination findings were normal and she said in April, 2004, that Plaintiff's back pain was stable. *Id.* These conclusions are not supported at all by any substantial evidence in the record. On February 12, 2004, Plaintiff told Dr. Holloman-Horton that she thought that her back pain was stable *because she had been minimally active*. R. 243. Plaintiff was examined by Dr. Holloman-Horton on January 6, 2004, and the check list for the examination of Plaintiff's back indicated "ABN" findings (abnormal). R. 244. There were no "back" findings on February 12, 2004. R. 243. On May 5, 2004, the findings again were "abnormal," with decreased range of motion in "all skeletal planes." R. 328. The findings were "abnormal" again on May 27, 2004, R. 327, June 21, 2004, R. 326, July 21, 2004, R. 325, August 20, 2004, R. 324, September 14, 2004, 323, and October 8, 2004, with decreased range of motion in all planes on October 8, 2004. R. 322. On December 20, 2004, Plaintiff was seen by Dr. Lakshmin, who noted low back pain and spasm, and Plaintiff was unable to do the straight leg raising test. R. 367.

The Administrative Law Judge next discussed evidence that in November, 2005, Dr. Mathews "reported only mild tenderness to palpation, full strength in lower extremities, some back pain, mild radicular pain with straight leg raise maneuver on the left at about 60 degrees, negative on the right, no evidence of atrophy and only slight decreased sensation on the left lateral thigh and calf." R. 39. He also noted that in January, 2006, "Dr. Mathews reported that imaging studies revealed very minimal anterolisthesis at L5-S1, significant degenerative disc disease at L5-S1 and pseudoarthrosis." *Id.*

Before discussing this evidence from Dr. Mathews, one should not overlook the

significant findings by Pain Management Specialists in Tallahassee on May 10, 2005.

R. 351.  Plaintiff was found to have a positive finding for paresthesia into the left leg and

into the great and second toes.  R. 352.  On examination, tenderness was found on

palpation of the left sacroiliac joint.  *Id*.  Plaintiff's muscle strength in her lower

extremities was 5/5, and straight leg raising was negative bilaterally.  *Id*.  Patrick's exam

was positive on the left.  *Id*.  Plaintiff's toe walk was painful.  *Id*.  Her range of motion of

the lumbar spine was limited.  *Id*.  A facet load test could not be performed because the

test was too painful for Plaintiff to extend her back.  *Id*.  The assessment was low back

pain with radiculopathy.  *Id*.  It was determined that continued use of Duragesic and

Percocet was appropriate. R. 353.

Dr. Mathews made the findings described by the ALJ in November, 2005, and in

January, 2006, but the ALJ's discussion left out important findings.  On November 23,

2005, Dr. Mathews also reviewed the MRI from a year earlier and determined that *there*

*did not appear to be an interbody fusion* after the last surgery.  R. 312.  Dr. Mathews

further thought that it was possible that Plaintiff "can still have persistent mechanical

back pain with continued motion at the degenerative disc despite attempts at

stabilization fusion."  *Id*.  Further surgery was needed, said Dr. Mathews, depending on

the results of lumbar discography.  *Id*.  But on December 28, 2005, Dr. Mathews found

that Plaintiff had not been able to complete the discogram "*secondary to significant pain*

*related to the procedure*."  R. 349 (emphasis added).  Dr. Mathews also noted on that

date that Plaintiff wanted to be gainfully employed but was unable to work for the past

three years due to persistent pain and radicular complaints. *Id.* Plaintiff agreed to undergo another surgery. *Id.* The third surgery occurred on January 10, 2006. R. 348. During the operation, it was determined that the S1 screw had fractured. R. 340. In sum, the evidence described by the ALJ was incomplete and was not substantial evidence to disregard the opinions of the treating physicians, especially the opinion of Dr. Mathews.

Next, the ALJ wrote that in March, 2006, Dr. Mann found that two and one-half months after surgery, Plaintiff was doing well and had been able to reduce her pain medications. R. 39. He noted that on examination, Dr. Mann found that her surgical wound was healed, and she had good strength in her legs with "no straight leg raise." *Id.* These findings are correct, though the physician was Dr. Mathews. R. 390. That Plaintiff did well shortly after the third surgery is important evidence, but after the previous two surgical failures, the issue is whether these improvements would persist.

As to that issue, the ALJ said that Dr. Macri began to treat Plaintiff's pain in April, 2006, and in May, reported that she "looked much better, had increased flexibility and was swimming twice a week." R. 39. The ALJ said that Dr. Macri said that Plaintiff's pain "appeared to be better controlled," and a Duragesic patch was prescribed because Plaintiff had had good results with this in the past. *Id.* The ALJ noted that Dr. Macri said in June, 2006, that Plaintiff was losing weight and her mood was "uplifted." *Id.*

Again, these findings leave out important findings by the treating physician. Dr. Macri said on April 20, 2006, that Plaintiff was then taking Percocet, 4 to 5 tablets daily, and Robaxin, 4 tablets daily, indicative of continued severe pain. R. 384. Plaintiff was

not then driving (although a short time before she had been able to drive herself from Tennessee to Florida). R. 385. Dr. Macri said that Plaintiff had poor posture and fatigues easily. *Id.* He said that it was "difficult for her to sit for long periods of time. Her pain gets worse." *Id.* Plaintiff's pain was "somewhat relieved with walking," but he thought that she could not sit or walk for longer than an hour at a time. *Id.* He found on examination that Plaintiff could not squat more than 1.5 inches, and her "range of motion is severely decreased," 40% in all planes, indicating a continued severe impairment, despite the third surgery. *Id.* Dr. Macri said that he had to control Plaintiff's pain "while the healing process continues," and said that he would have to "wait and see if the fusion will take it." *Id.* He planned to "start tapering *up* dosages of Methadone" in an effort to wean Plaintiff from narcotics. R. 386, 383 (emphasis added). He also prescribed Percocet, 5 or 6 times a day, which is the continued use of a strong narcotic. *Id.* He wanted to control Plaintiff's weight, by eating reduction and by increasing mobility and cardiovascular endurance. *Id.* He noted that Plaintiff had a pool, and he wanted her to start pool therapy, four or five times a day. *Id.* On May 11, 2006, however, Dr. Macri said that Methadone had caused Plaintiff to experience extreme nausea, anxiety, and heart palpitations. R. 383. Thus, the trial of methadone was ineffective to wean Plaintiff from narcotics. Plaintiff had been swimming twice a week, which is more indicative of a strong desire to heal than an ability to work a 40 hour week. *Id.* Her pain was better controlled, but she still used Percocet 5 times daily. *Id.* Plaintiff said that the Duragesic patches had helped more than Percocet, so Dr. Macri prescribed Duragesic, and he limited her to Percocet 3 times daily. *Id.* On June

1, 2006, Plaintiff returned to Dr. Macri with a report of weight loss and continued use of pool therapy. R. 382. Her mood was "uplifted." *Id.* Her pain was currently controlled by Duragesic patches. *Id.* Considered as a whole, therefore, Dr. Macri's findings are not a basis for giving his opinion, as well as the opinions of Drs. Matthews and Mann, no weight at all.

Finally, the ALJ noted that on August 3, 2006, Dr. Matthews examined Plaintiff, and she told him that "she felt like her back was more stable." R. 40. Dr. Mathews said that Plaintiff had "mild difficulty in flexing her big toe on the left, but had good extension and good foot flexion and extension, and no straight leg raise." *Id.* The ALJ also noted that Dr. Mathews said that Plaintiff had no tenderness in her lumbar spine. *Id.* It was on this same date that Dr. Mathews rendered his residual functional capacity opinion. *Id.* The ALJ concluded that the opinions of Drs. Mann, Mathews, and Macri were "not accompanied by thorough, contemporaneous notes, and are not consistent with the totality of objective medical evidence of record, or the testimony given by the claimant at the hearing." *Id.*

The last findings regarding Dr. Mathews from the August 3, 2006, visit are accurate but again incomplete. Plaintiff told Dr. Mathews that she felt that her back was more stable, but he also said that "she still has a fair amount of back pain." R. 398. He noted that she was under the care of Dr. Macri, a pain specialist. *Id.* On examination, Dr. Mathews found no straight leg raise sign, no tenderness in the lumbar spine, and "mild difficulty in flexing her big toe on the left" but with "good extension and good foot flexion and extension." *Id.* Based upon his experience in treating Plaintiff, and her

medical history before that, Dr. Mathews concluded:  "Given the chronicity of her back and radicular complaints for many years, I do think it is reasonable that she is disabled from this condition."  *Id.*  In other words, despite some positive signs on that day, Dr. Mathews acknowledge that Plaintiff continued to have significant pain, had to be treated by a pain specialist with strong narcotic medications, and based his opinion as to Plaintiff's residual functional capacity upon his lengthy treatment history.

In summary, there are a few medical findings that seem inconsistent with the opinions of the three physicians.  Muscle atrophy was not observed in the lower extremity, which might mean that Plaintiff's pain is not so great that she is immobilized. Straight leg raising sometimes was negative for pain, though at other times, it was positive.   Plaintiff sometimes could walk on her heels and toes.  During some periods, especially after a surgery, Plaintiff seemed to be doing better.  But as noted earlier, this court's review of the decision for the support of substantial evidence in the record is a review of all of the evidence, not just some of the evidence.  Tieniber v. Heckler, 720 F.2d at 1253.  The ALJ selected only the evidence that might support a rejection of the opinions of three treating physicians, and discarded the stronger evidence that fully supported those opinions.  This was legal error and resulted in a decision that itself is not supported by substantial evidence in the record.

"Where the Secretary has ignored *or* failed properly to refute a treating physician's testimony, we hold as a matter of law that he has accepted it as true." *Id.* (emphasis added);  Elam v. Railroad Retirement Bd., 921 F.2d 1210, 1217 (11th Cir.

1991); <u>Critchfield v. Astrue</u>, 2009 WL 635698 (N.D. Fla. Mar 10, 2009) (No. 308cv32-RV/MD).  That is the proper remedy here.

**Plaintiff's credibility**

Plaintiff also contends that the ALJ improperly determined her testimony to be lacking in credibility.  That is probably so, given the findings above, but the court need not address this issue.

**Conclusion**

Considering the record as a whole, the findings of the Administrative Law Judge did not correctly follow the law and were not based upon substantial evidence in the record.  The decision of the Commissioner to deny Plaintiff's application for benefits should be reversed and benefits should be awarded.

Accordingly, it is **RECOMMENDED** that the decision of the Commissioner to deny Plaintiff's application for Social Security benefits be **REVERSED** and the Commissioner be **ORDERED** to grant Plaintiff's applications for benefits.

**IN CHAMBERS** at Tallahassee, Florida, on April 16, 2010.


**s/     William C. Sherrill, Jr.**
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**


<u>**NOTICE TO THE PARTIES**</u>

**A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14**

Case No. 4:09cv229-RH/WCS

**days after being served with a copy thereof. Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**